UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JESUS VARGAS,

      Plaintiff,

v.                        Case No.: 8:16-cv-1949-T-33JSS

MICHAELS STORES, INC.,

      Defendant.

_____/

**ORDER**

This matter comes before the Court upon consideration of Defendant Michaels Stores, Inc.'s Motion for Summary Judgment, filed on May 15, 2017. (Doc. # 34). Plaintiff Jesus Vargas filed a response in opposition on June 14, 2017. (Doc. # 47). Michaels replied on June 28, 2017. (Doc. # 48). For the reasons that follow, the Motion is granted in part and denied in part.

**I.   Background**

**A.   Vargas's Employment and Move to Florida**

Vargas, who is from Puerto Rico and identifies as Hispanic, began working for Michaels, a national chain of arts and crafts stores, in Puerto Rico over twenty years ago. (Vargas Dep. Doc. # 35 at 42:19-25, 43:20-44:3). Michaels subsequently closed its stores in Puerto Rico and, at some

1

point, Vargas moved to the United States. (Id. at 43:8-44:3).
Vargas began working for Michaels again in New York in 2010
as a store manager. (Id. at 47:15-49:3). After the New York
store in which Vargas worked closed, he was transferred at
his request to a store in Florida in 2011. (Id. at 52:6-
53:17). Vargas hoped to return to Puerto Rico when Michaels
eventually reopened stores there. (Id.). The reopening of
stores in Puerto Rico was being planned by Michaels's
management in the Tampa, Florida area. (Id. at 52:15-53:4).

In September of 2013, Vargas was transferred to a store
in Tampa, referred to as the South Dale Mabry store, to serve
as store manager. (Id. at 67:17-24). Vargas was the only
Hispanic store manager in the district. (Doc. # 47-3). As
store manager, Vargas's duties included "manag[ing] the daily
operations of the store and ensur[ing] the execution of
company policies, procedures and programs to achieve store
sales and profit goals" and "manag[ing] and supervis[ing] the
Customer Experience." (Doc. # 35-2 at 1). Although there were
other manager positions for specific departments, it was
ultimately the store manager's responsibility to ensure the
store ran properly and met all of its goals. (Zenn Dep. Doc.
# 36 at 40:2-20). Vargas's supervisor at the time of his
transfer to the South Dale Mabry store was district manager

Dave Ticich, who oversaw all the stores in the district. (Vargas Dep. Doc. # 35 at 67:17-20; Ticich Dep. Doc. # 38 at 10:22-24, 19:3-5). Ticich never disciplined Vargas. (Ticich Dep. Doc. # 38 at 21:22-22:6). Ticich was eventually terminated based on allegations of inappropriate behavior toward female employees. (Id. at 11:19-12:18).

In March of 2014, Vargas's new district manager, Jamie Zenn, who had recently replaced Ticich, gave Vargas a "meets expectations — high" grade on his annual performance evaluation and awarded Vargas a bonus of over $18,000, the largest Vargas ever received. (Vargas Dep. Doc. # 35 at 147:5-148:2; Doc. # 35-9 at 3). Zenn entered the evaluation into the computer system using the store's performance numbers provided by Ticich for the previous year, after a conversation with the Zone Human Resources Director Shawn Gingrich and the Zone Vice President. (Zenn Dep. Doc. # 36 at 25:21-26:14, 31:5-32:2). Although Zenn issued the evaluation, Vargas believes Ticich wrote the document before his termination and Zenn merely delivered it to Vargas. (Vargas Dep. Doc. # 35 at 148:3-18).

### B. <u>Failed Audit and Performance Discussion Records</u>

The South Dale Mabry store did have some problems. On July 11, 2014, Zenn went on a store tour with Vargas —

essentially an unofficial store audit — and gave the store a
"C," a failing grade. (Zenn Dep. Doc. # 36 at 86:4-87:24;
Doc. # 36-5). The frequency of such store tours depended on
how well a store was running. (Zenn Dep. Doc. # 36 at 87:17-
24).

A formal audit occurred on July 17, 2014, and the store
failed. (Id. at 67:20-68:17; Doc. # 36-4). The auditor, Erick
Totten, gave Vargas and his assistant manager Don Colbeth an
action plan listing areas that needed improvement and had
Vargas and Colbeth describe the steps they would take to
prepare for the next formal audit. (Vargas Dep. Doc. # 35 at
121:15-16, 126:15-127:25; Doc. # 35-4).

Because of the failed audit, Zenn issued a performance
discussion record, giving Vargas a written warning. (Zenn
Dep. Doc. # 36 at 61:3-5; Doc. # 36-4). Zenn typically gave
store managers written warnings if their stores failed an
audit, and human resources was required to approve before a
written warning could be given. (Zenn Dep. Doc. # 36 at 61:6-
18, 63:3-8). The written warning stated that, thirty days
after the failed audit, the "store must pass all District
Manager lead audits." (Doc. # 36-4). It also specified that
the store would "be audited at least once a month until the

official re-audit occurs," and that the store must pass those informal audits. (Id.).

Although Zenn stated assistant managers would typically receive a written warning after a failed audit, Colbeth was only given a verbal warning. (Zenn Dep. Doc. # 36 at 83:22-84:6; Colbeth Dep. Doc. # 44 at 13:22-14:11).

### C. Conflict with Employees

In addition to the failed audit, some employees complained to human resources or the district manager about Vargas's management style. Around October of 2013, before Zenn became district manager, then-sales associate Cailyn Arrington complained to district manager Ticich about Vargas's "demeanor and attitude towards his associates." (Arrington Dep. Doc. # 37 at 21:8-22:8, 23:19-25:6). Ticich spoke to Arrington and then Vargas, though Vargas alleges the conversation was only about his complaint that Arrington frequently missed work because of illness. (Vargas Dep. Doc. # 35 at 70:9-73:13; Arrington Dep. Doc. # 37 at 22:9-20, 40:15-41:8). Although Arrington stated Vargas tried harder to treat associates respectfully after she complained, Arrington also felt Vargas treated her poorly after Ticich spoke with him about her complaint. (Arrington Dep. Doc. # 37 at 23:5-18, 39:21-40:17). He scheduled her fewer hours to work and

"would reprimand [her] in front of other cashiers and customers and other associates in the store." (Id. at 39:21-42:12; Doc. # 37-2 at 1-2).

On September 8, 2014, Vargas had a confrontation with the replenishment manager, Courtney Williamson, during which they raised their voices and Williamson called Vargas a "prick." (Vargas Dep. Doc. # 35 at 142:25-143:12; Williamson Dep. Doc. # 40 at 22:13-23:6; Colbeth Dep. Doc. # 44 at 26:2-30:14). Williamson told Vargas she did not like the way he spoke to her because "[h]e would speak to [her] like [she] was a child." (Williamson Dep. Doc. # 40 at 26:12-19). Vargas called the HR hotline and complained about Williamson's conduct. (Vargas Dep. Doc. # 35 at 142:25-143:12). Colbeth, who overheard the conversation, wrote a statement describing the incident. (Doc. # 44-3).

According to Vargas, Zenn came to the store to speak with him, Williamson, and Colbeth about the incident, but Vargas did not feel that Williamson was truly apologetic. (Vargas Dep. Doc. # 35 at 145:20-146:9). Instead, Vargas felt Williamson was out to get him. (Id. at 146:10-12). Nevertheless, Vargas told Williamson he would work on his communication style and the parties ended the conversation by shaking hands and agreeing to move forward. (Id. at 26:23-

27:1; 28:12-18; Doc. # 44-3). Williamson was not disciplined for the incident. (Williamson Dep. Doc. # 40 at 26:4-6).

### D. **Dentures Incident**

Another incident involved a sales associate named Tina Morrow. Morrow, who wears dentures, realized after arriving to work in the morning on August 29, 2014, that she had left her dentures at home. (Morrow Dep. Doc. # 39 at 25:25-26:12). She asked a supervisor, replenishment manager Williamson, if she could go home to quickly retrieve them. (Id.). Vargas learned why Morrow had left and, later that day, was overhead by Morrow and others speaking to assistant manager Colbeth, as though he had no teeth. (Id. at 31:20-32:10; Doc. # 39-1; Doc. # 39-2). Morrow and the employees who witnessed the incident interpreted this as mocking Morrow. (Morrow Dep. Doc. # 39 at 30:7-9; Faircloth Dep. Doc. # 41 at 30:12-32:8; Williamson Dep. Doc. # 40 at 19:11-20:6; Doc. # 40-1). Morrow also stated Vargas grabbed his crotch and wondered aloud "how it would feel to get a [blowjob] from someone [with] out no teeth." (Doc. # 39-1 at 1; Doc. # 39-2 at 1). Vargas denies this incident occurred, and Colbeth stated he does not recall Vargas making any jokes about Morrow's teeth. (Vargas Dep. Doc. # 35 at 140:18-141:2; Colbeth Dep. Doc. # 44 at 24:1-22).

Nevertheless, Morrow reported the incident through calls to human resources and Zenn within a few days, and later gave Zenn a written statement. (Morrow Dep. Doc. # 39 at 23:16-24:23; Doc. # 39-1; Doc. # 39-2). Williamson, who witnessed the incident, also provided a written statement to Zenn. (Williamson Dep. Doc. # 40 at 18:19-19:3; Doc. # 40-1). Arrington submitted an anonymous letter complaining about this incident, which she had not witnessed firsthand, as well as Vargas's general treatment of his subordinates. (Arrington Dep. Doc. # 37 at 38:10-39:8, 47:7-48:9; Doc. # 37-2 at 1-2). Arrington wrote that she submitted the letter anonymously because "the last time [she] came forward, [her] concerns were brought to Jesus and he held a grudge against [her] for months." (Doc. # 37-2 at 1).

Zenn spoke with Vargas at the store about the dentures incident. (Vargas Dep. Doc. # 35 at 139:23-141:6). Although Vargas denied making fun of Morrow, Zenn concluded the incident "probably happened" but did not warrant discipline because "there was not enough evidence to totally prove that these issues did or did not occur." (Zenn. Dep. Doc. # 36 at 101:15-23; Doc. # 36-6). Instead, Zenn issued Vargas a coaching, dated September 15, 2014, on "how to talk to his associates and the right and wrong ways to treat his

associates." (Doc. # 36-6). A coaching is not a disciplinary action. (Zenn Dep. Doc. # 36 at 103:9-24). According to Vargas, Zenn never gave him the coaching document. (Vargas Dep. Doc. # 35 at 139:24-140:17).

### E.    **Transfer of New Replenishment Manager**

In September or October of 2014, Brynn Roberts, who is white, was transferred to the South Dale Mabry store to work as replenishment manager. (Zenn Dep. Doc. # 36 at 139:1-11; Roberts Dep. Doc. # 42 at 16:7-23, 32:5-13). Roberts had worked as a store manager for Michaels in Maryland, but asked to be transferred to Florida to be closer to her ailing mother. (Roberts Dep. Doc. # 42 at 79:11-80:11). She was transferred to the South Dale Mabry store without having met with Vargas, or otherwise having Vargas approve the transfer. (Doc. # 10 at ¶ 25; Zenn Dep. Doc. # 36 at 146:25-147:16). According to Zenn, the store manager would not have a say in whether an employee would be transferred to his store if that employee requested the transfer, was in good standing, and there was an opening at the store. (Zenn Dep. Doc. # 36 at 148:6-149:8; Roberts Dep. Doc. # 42 at 30:7-19)

The relationship between Vargas and Roberts was contentious. Roberts took it upon herself to make suggestions to Vargas about improving the store's performance and

employees' compliance with Michaels's policies. (Roberts Dep. Doc. # 42 at 57:4-60:14; Doc. # 42-3). Roberts complained in an October 3, 2014, email to Zenn about a particular incident between herself and Vargas. (Doc. # 42-3). According to Roberts, during one such conversation, Vargas told Roberts "to stop being a police dog and focus on the real issues." (Id.). When Roberts "questioned [Vargas] on how [they] can collectively hold a team accountable that way, [Vargas] got pissed off and walked out of the office." (Id.). She stated that, if things did not change, she would seek reassignment to another store. (Id.; Roberts Dep. Doc. # 42 at 62:23-64:4).

Vargas was similarly chafed by Roberts's presence. He believed Roberts was "question[ing] [his] authority on the decisions [he] made in the store" and "trying to set [him] up." (Vargas Dep. Doc. # 35 at 79:18-22, 80:13-18). Vargas felt Roberts failed to follow store policies, such as processing the unloading of trucks and filling out a board regarding who was on staff and the amount of merchandise received. (Id. at 79:2-10). As a result of her failure, Vargas felt Roberts was risking the store's passing the next store audit. (Id. at 81:3-21).

Yet, Vargas never disciplined Roberts, even though store managers can discipline the managers and associates working under them. (Vargas Dep. Doc. # 35 at 118:24-119:16). Instead, Vargas urged Zenn to speak to Roberts about his concerns and decide the proper disciplinary action. (Vargas Dep. Doc. # 35 at 77:14-78:23). Zenn never did. (Id. at 78:11-25).

### F.    Loss Prevention Investigation and Complaints

Subsequently, complaints were made about Vargas to Michaels's loss prevention department. Morrow reported to loss prevention that she had seen Vargas remove a Christmas tree some months before, approximately in October or November of 2014. (Morrow Dep. Doc. # 39 at 50:10-22). Vargas had told her the tree was being transferred to another store, but Morrow later found out no such transfer had occurred. (Id. at 52:5-53:9). Morrow also reported to loss prevention that she saw Vargas's wife in the store before opening in February or March of 2014, but she had not realized then that it was against Michaels's policy. (Id. at 47:12-48:18, 51:13-52:1). On December 5, 2014, Morrow provided written statements to Zenn recounting the incidents she reported to loss prevention. (Doc. # 39-3).

In the statements provided to Zenn, Morrow also noted a time in December of 2014, when Vargas yelled at cashiers for

11

working too slowly, even though customers could hear him, and a time when Vargas gave an additional fifty percent discount on clearance items to "a Spanish customer." (Id.). Morrow had heard Vargas speaking Spanish with the customer and, when Zenn asked her to write her statement and what the customer looked like, she noted the customer was Spanish. (Morrow Dep. Doc. # 39 at 57:5-20). Morrow disliked Vargas, and had told her co-worker Arrington that "[she] want[ed] him gone." (Arrington Dep. Doc. # 37 at 74:18-23).

Roberts also provided a written statement to Zenn concerning loss prevention, saying she

> witnessed the store manager, Jesus of [store] 3708, leave the store before opening for anywhere between 10 and 30 minutes. In those times, I have seen him leave with things in his hand but not sure of product and quantity. I also overheard him telling another associate that he was bringing a Christmas tree to the Bruce B. Downs store. He did leave the store with that tree.

(Doc. # 42-2; Roberts Dep. Doc. # 42 at 53:1-54:12). And, in a December 20, 2014, statement that customer experience manager Melinda Faircloth faxed to Zenn, she reported a discrepancy in the amount of money in the cash drawer. (Doc. # 41-2).

Gary Graves, an investigator with Michaels's loss prevention department, interviewed Vargas on December 22,

2014. (Vargas Dep. Doc. # 35 at 131:21-132:4; Doc. # 35-7).
Vargas denied the accusations of taking merchandise but
admitted to letting his son come into the store before opening
hours at least once. (Vargas Dep. Doc. # 35 at 129:8-131:4,
138:2-12; Doc. # 35-7 at 1-2). Because it is against company
policy to allow non-staff members into the store before
opening, Vargas was given a final warning on December 23,
2014. (Doc. # 35-8).

### G.    Performance Improvement Plan

Also on December 23, 2014 — the same day Vargas received
the final warning — Zenn placed Vargas on a performance
improvement plan (PIP), which Zenn had drafted based in part
on his observations during store tours. (Zenn Dep. Doc. # 36
at 226:11-14, 235:4-9, 242:21-243:12; Doc. # 36-19). The PIP
listed four separate store objectives, with various store
operating procedures (SOP) enumerated under each objective,
and set a deadline of January 23, 2017, by which the store
should meet the listed objectives. (Doc. # 36-19; Zenn Dep.
Doc. # 36 at 236:23-237:14, 240:21-241:20). For example,
Objective 4, labeled "HR Guidelines and Customer Service,"
lists four SOPs:

> 1.    Store Manager must ensure proper uses of
> headsets are being followed by all associates
> including management. Communication must be proper

and within Michaels guidelines. All associates are
treated with respect and dignity.

2. Performance discussions must be done in the
office and off the sales floor. Praise and coaching
on the sales floor and all other items to be
addressed within the office.

3. Craft Your Opinion scores must be at or above
the company average within 30 days. Please ensure
that all associates are performing at company
standards with greeting, assisting customers, clean
store and restrooms, fast and friendly checkout.
This is not all encompassing . . . . This pertains
to all scores on the CYO results.

4. No unauthorized associates or Non-Michaels
personnel are to be in building before store
opening time.

(Doc. # 36-19 at 7). According to Vargas, the store was
exceeding expectations for sales and the SOPs listed on his
PIP were generic and inapplicable to his performance. (Vargas
Dep. Doc. # 35 at 84:8-12, 151:4-152:2, 159:11-23, 164:8-25;
Doc. # 36-19).

Performance improvement plans typically lasted a total
of sixty to ninety days, but were broken into thirty day
intervals to serve as checkpoints to review the progress being
made. (Zenn Dep. Doc. # 36 at 44:20-45:17, 238:22-239:18;
Gingrich Dep. Doc. # 43 at 67:18-68:20). All PIPs are drafted
by the district manager and then approved by HR before they
are issued. (Zenn Dep. Doc. # 36 at 41:13-42:5, 236:15-19;
Gingrich Dep. Doc. # 43 at 17:21-18:4). Managers who are on

a PIP at the end of the fiscal year are not qualified to receive a bonus for that year. (Zenn Dep. Doc. # 36 at 47:25-48:20). Vargas was put on PIP about one month before the fiscal year ended and eligibility for bonuses was decided. (Vargas Dep. Doc. # 35 at 98:4-16).

Vargas refused to sign the PIP because he disagreed the store needed improvement in the objectives listed in the PIP. (Id. at 98:4-9, 152:7-12, 154:3-15). Believing his store's performance did not warrant a PIP and that Zenn failed to provide the store with sufficient support, Vargas asked Zenn if he was being put on PIP because he was Hispanic and because Zenn wanted to replace him with Roberts. (Vargas Dep. Doc. # 35 at 83:2-21). Zenn denied that the PIP was related to Vargas's race or national origin, but that Vargas should go to HR if he wished. (Id. at 83:11-13). But Vargas did not complain to HR that the PIP was discriminatory, and Vargas admits that Zenn never made any discriminatory statements about Vargas's race or national origin. (Id. at 87:5-88:15-18).

According to Vargas, Zenn then informed him that store managers rarely recover from being placed on PIP and "it's going to look better if you start looking for another job." (Id. at 164:9-23, 165:15-22). Zenn and Gingrich deny there

was an unwritten rule that a store manager who received a PIP would be terminated. (Zenn Dep. Doc. # 36 at 47:14-20; Gingrich Dep. Doc. # 43 at 24:21-25:6).

Around this time, Vargas called Ticich, who no longer worked at Michaels, to discuss his placement on the PIP. Vargas testified that Ticich stated it was possible to recover from being placed on a PIP, that it was wrong for Zenn to tell him to start looking for another job, and that he did not think Michaels would fire Vargas because he is Hispanic. (Vargas Dep. Doc. # 35 at 173:4-174:5). Ticich denies telling Vargas during the call that his being placed on PIP was related to his race or national origin. (Ticich Dep. Doc. # 38 at 41:5-13).

### H.    Retaliation Allegations and Termination

On December 20, 2014, Faircloth, who was a customer experience manager at the time, submitted a statement to Zenn in which she stated Vargas "asked [her] if [she] knew who called the HR confidential hotline" and "asked [her] to inform him whenever someone makes a complaint or informs [her] that they are going to call the hotline or [Zenn] so he can correct any issues before." (Doc. # 41-1 at 2; Faircloth Dep. Doc. # 41 at 50:8-23). Vargas concluded the conversation by saying "that he must 'take drastic measures to save his job.'" (Doc.

# 41-1 at 2; Faircloth Dep. Doc. # 41 at 36:12-37:2, 38:8-15).

Faircloth's letter also reported Vargas had told her "that the responsibility and accountability for the front end and all the cashiers and back up cashiers was on [her and Arrington's] shoulders" and that they would "take the blame for anything that goes wrong since he has to step back from reprimanding associates." (Doc. # 41-1 at 2). Faircloth felt this was inappropriate because Vargas, as store manager, "cannot just alleviate [sic] all of that responsibility onto [her] shoulders." (Faircloth Dep. Doc. # 41 at 52:6-14). Arrington similarly complained in a written statement to Zenn that, among other things, Vargas had informed her and Faircloth they were "going to be held accountable for the front end, and that he was going to be stepping back from customer service." (Doc. # 37-2 at 3-4). This concerned Arrington because Vargas's job "as Store Manager is to maintain customer service throughout the store" and Vargas was "supposed to be the final step in trying to fix any issues [they] have with behaviors and attitudes of cashiers and sales associates." (Id.).

Vargas denies he requested the names of employees who complained about him in order to retaliate. Instead, Vargas

asserts he spoke with Arrington and Faircloth to proactively address any problems with his leadership that had led to the complaints. (Vargas Dep. Doc. # 35 at 171:8-172:8).

Zenn received Faircloth's complaint three days before Zenn issued Vargas the PIP and then sent the statement to Zone Human Resources Director Gingrich. (Zenn Dep. Doc. # 36 at 221:12-222:20, 231:16-21). Zenn did not speak to Vargas about the retaliation complaint when he issued Vargas the PIP and final warning because Faircloth's complaint was unrelated to the loss prevention investigation and HR had not yet determined how to proceed on Faircloth's complaint. (Id. at 221:17-25, 222:8-16, 223:1-18). Gingrich did not recall receiving the complaint and neither Zenn nor Gingrich recalled investigating the allegations. (Id. at 229:8-230:5; Gingrich Dep. Doc. # 43 at 64:7-8, 65:14-16).

On January 21, 2015, two days before the thirty day period of the PIP ended, Zenn terminated Vargas. (Vargas Dep. Doc. # 35 at 98:17-99:4, 167:23-168:6; Zenn Dep. Doc. # 36 at 231:5-8; Doc. # 36-14). Zenn told Vargas the decision had been made by HR because Vargas created a hostile work environment. (Vargas Dep. Doc. # 35 at 99:8-20). In his deposition, Zenn asserted that retaliating against an associate who complained creates a hostile work environment

18

and an employee who retaliates "can and would be terminated for retaliation." (Zenn Dep. Doc. # 36 at 207:9-15). Indeed, according to Zenn, Vargas was terminated only because "he went around asking associates who called the hotline, who told on him, and stuff like that, and there's some statements for that." (Id. at 209:1-5). Michaels's Handbook for employees states, under the heading Retaliation,

> Michaels will not permit retaliation against anyone, who, in good faith, files a complaint, assists another associate to complain or participates in an investigation. If you feel as if you have been subjected to retaliations or adverse action resulting from an investigation, you should immediately report the problem to your Supervisor, Supervisor's Manager and/or Human Resources Representative. **Retaliation can lead to corrective action, up to and including termination of employment.**

(Doc. # 35-1 at 16)(emphasis added). The decision to terminate Vargas was made by Gingrich as Zone Human Resources Director. (Zenn Dep. Doc. # 36 at 230:12-14, 232:14-16; Gingrich Dep. Doc. # 43 at 13:12-24).

After his termination, Vargas learned that two Hispanic Michaels store managers in New York that Vargas knew, Marco Salazar and Daniel Narvaez, had also been terminated at some point. (Vargas Dep. Doc. # 35 at 175:20-176:11; 178:8-16; 182:14-183:19). During phone calls with them, they expressed their belief that their terminations were related to their

race and occurred to deny them bonuses. (Id.). Still, Vargas never complained to Michaels's HR that he was harassed because of his race or national origin during his employment or that the decision to terminate him was discriminatory. (Id. at 100:25-101:19).

Soon after Vargas's termination, Roberts became store manager of the South Dale Mabry store. (Roberts Dep. Doc. # 42 at 36:13-24). Roberts alleges Zenn told her about Vargas's impending termination a week beforehand and informed her that she would be taking over the store manager position. (Id. at 37:2-38:6). Zenn does not recall this and doubted he said it because "if there's a store manager who is still employed, you would not be saying that." (Zenn Dep. Doc. # 36 at 158:2-15, 159:2-28). Hourly managers were typically interviewed by the district manager, HR, and the Zone Vice President before being promoted to store manager. (Id. at 155:19-156:4).

Regardless, Roberts worked as store manager shortly after Vargas's termination. Sometime in January of 2015, the store underwent another formal audit, which it passed. (Zenn Dep. Doc. # 36 at 56:7-16). A few months later, in May of 2015, Roberts was terminated for allegedly falsifying documents. (Zenn Dep. Doc. # 36 at 275:11-276:3; Roberts Dep. Doc. # 42 at 17:19-20, 18:21-22).

## I.    **Procedural History**

Vargas initiated this action on July 5, 2016. (Doc. # 1). In his Amended Complaint, Vargas alleges Michaels discriminated against him based on his race and national origin, and created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.; 42 U.S.C. § 1981; and the Florida Civil Rights Act, Fla. Stat. §§ 760.01 et seq. (Doc. # 10). Michaels filed its answer on August 15, 2016. (Doc. # 11). At the Court's direction, the parties mediated on April 12, 2017, but met an impasse. (Doc. ## 22, 31).

Michaels then filed its Motion for Summary Judgment on May 15, 2017. (Doc. # 34). Vargas responded on June 14, 2017, and Michaels replied on June 28, 2017. (Doc. ## 47, 48). The Motion is ripe for review.

## II.  **Legal Standard**

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude

a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996)(citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to

be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing <u>Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

The analysis is the same for the claims under Title VII, § 1981, and the FCRA. <u>See</u> <u>Wen Liu v. Univ. of Miami Sch. of Med.</u>, No. 15-14351, — F. App'x —, 2017 WL 2210867, at *2 (11th Cir. May 19, 2017)("Claims of race discrimination arising under § 1981 have the same requirements of proof and use the same analytical framework as Title VII claims. Since the FCRA is patterned after Title VII, the same is true for FCRA claims." (internal citations omitted)). Vargas alleges

Michaels created a hostile work environment and discriminated against him based on his race and national origin. The Court will address each claim in turn.

### A. Hostile Work Environment Claims

"To establish a claim of a hostile work environment, an employee must prove that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1248 (11th Cir. 2014)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Establishing a prima facie case of hostile work environment requires a plaintiff to show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). Even if the plaintiff is able to prove one factor in the prima facie case, this "does not compensate for the

absence of the other factors." <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1248 (11th Cir. 1999).

Michaels does not dispute Vargas is a member of a protected group based on his race and national origin. But it does dispute that Vargas was harassed, the harassment was based on Vargas's protected characteristics, and any harassment was objectively severe or pervasive. (Doc. # 34 at 12-17).

In his response, Vargas claims he can satisfy the second prong — harassment — based on (1) the allegedly false complaints by his subordinate Morrow, and the failure of Zenn to reprimand Morrow for complaining; (2) Vargas's placement on a PIP for purportedly false reasons; (3) his subordinate Williamson's calling Vargas a "prick," but not being disciplined by Zenn; and (4) Zenn's transferring Vargas's subordinate Roberts to the store without consulting Vargas, and refusing to discipline Roberts at Vargas's request. (Doc. # 47 at 17).

Even assuming that conduct qualifies as harassment, Vargas offers insufficient evidence to show the treatment was related to his race or national origin, as required for the third element of a hostile work environment claim. Vargas has not presented any comments made to him regarding his race or

national origin. At most, Vargas can point to one complaint of his subordinate Morrow, who noted in a statement to Zenn that Vargas gave an additional fifty percent discount on clearance merchandise to "a Spanish customer." (Doc. # 39-3 at 2). Morrow testified she specified the customer was Spanish because she had overheard Vargas speaking Spanish to the customer and Zenn had asked her what the customer looked like. (Morrow Dep. Doc. # 39 at 57:5-20).

But, according to Vargas, "Zenn specifically inquired whether [Vargas] knew a Spanish-speaking customer" with the implication "from Zenn [being] that [Vargas] may have known the customer because they were Hispanic." (Doc. # 37 at 17). Additionally, Vargas notes that he was the only Hispanic store manager in his district. (Doc. # 47 at 17; Doc. # 47-3). He also focuses on Zenn's investigation and disciplining of one store manager of a different store, Dutka, and of Vargas's subordinate managers — assistant manager Colbeth, replenishment manager Williamson, and then-replenishment manager Roberts. (Doc. # 47 at 17). Vargas asserts that because Zenn did not reprimand or discipline these managers, the discipline Vargas received was based on his race and national origin.

The fact that Vargas was the only Hispanic store manager in Zenn's district alone does not give rise to the inference that his termination was based on race. See, e.g., Loving v. Lew, 512 F. App'x 616, 619 (7th Cir. 2013)("Loving does not dispute the district court's finding that the record lacks any evidence that Fox bore ill will toward her because of her race, and the fact that she was the only black employee in her group is insufficient to support that inference."); Bryant v. Brownlee, 265 F. Supp. 2d 52, 65 (D.D.C. 2003)("In the absence of some greater indicator of race or age bias, the uniqueness of plaintiff's race and age in her workplace cannot substantiate a claim that plaintiff's workplace was permeated with *discriminatory* intimidation, ridicule, and insult." (internal quotation marks and citation omitted)).

And, even if Zenn did not support Vargas's performance and disciplined him more harshly, such treatment would only be actionable if it was based on Vargas's race or national origin. See Coutu v. Martin Cty. Bd. of Cty. Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995)("Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII."). Vargas's receipt of harsher discipline than one other store manager and some of his own subordinate managers does not create the

inference that his punishment was based on his race or national origin. The relationship between Zenn and Vargas was strained, which led to what Vargas considered harsh treatment, but this is not evidence supporting that Vargas's race or national origin was the root of that strain. See Mann v. Miami-Dade Cty. Corr. & Rehab., No. 09-22456-CIV, 2010 WL 11426147, at *4 (S.D. Fla. July 27, 2010)("Although it is clear that Mann and Luengas may have harbored some dislike for one another and that may have made Mann's job more difficult and stressful, Mann has not established that she was subjected to hostile work environment due to her race or sex. Mann only speaks of the harsh manner in which her supervisors allegedly dealt with her. This, however, is not sufficient evidence of harassment.").

Furthermore, Zenn testified store manager Dutka was not disciplined because Dutka did not actually violate a SOP or falsify documents. (Zenn Dep. Doc. # 36 at 140:10-145:8). And, as for Colbeth, Williamson, and Roberts, they all held positions of lower responsibility as assistant manager or replenishment manager working under Vargas. That Zenn chose to differently discipline subordinate employees — whom Vargas himself had authority to discipline — does not support the inference that Vargas was disciplined because of his race or

national origin. For example, while Zenn gave Vargas a written warning for failing the July of 2014 audit but gave assistant manager Colbeth only a verbal warning, Zenn issued written warnings to every store manager who failed a formal audit. (Zenn Dep. Doc. # 36 at 61:6-18, 63:3-8).

The fourth element requires a plaintiff to prove the work environment is both subjectively and objectively hostile. Adams, 754 F.3d at 1249. "The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Mendoza, 195 F.3d at 1246 (citation and internal quotation marks omitted). "In assessing the objective component, four factors should be considered: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance." Body v. McDonald, No. 8:13-cv-1215-T-33TGW, 2014 WL 7224814, at *8 (M.D. Fla. Dec. 17, 2014), aff'd sub nom. Body v. Sec'y, Dep't of Veterans Affairs, 616 F. App'x 418 (11th Cir. 2015).

Vargas subjectively perceived the allegedly harassing conduct as severe and pervasive. (Doc. # 47 at 18). But, taking the facts in the light most favorable to Vargas, the alleged harassment was not objectively severe and pervasive. The conduct — Vargas's subordinates submitting complaints about his behavior, Zenn's not disciplining Vargas's subordinates, his transferring a department manager to the store without consulting Vargas, and placing Vargas on the PIP — was not physically threatening or humiliating. See Godoy v. Habersham Cty., 211 F. App'x 850, 853-54 (11th Cir. 2006)(affirming summary judgment against a South American plaintiff who was subjected to racial slurs "almost every shift," was battered by his supervisor, threatened over the phone, and told "to go back to his boat and sail to South America where he belongs"). The conduct occurred over approximately five months and was far less severe than that found insufficient in other cases. See Adams, 754 F.3d at 1254 (finding an African-American plaintiff's treatment was not objectively hostile even though he occasionally heard racial slurs, frequently saw racist graffiti in the bathroom, and often saw coworkers wearing clothing emblazoned with the Confederate flag because the slurs were not directed at him,

the graffiti was cleaned regularly, and his exposure to the flag was "not directly humiliating or threatening").

While the complaints about him and his being forced to work with Roberts may have made Vargas's job more difficult, there is no evidence that Zenn and the employees' behavior *unreasonably* interfered with Vargas's job performance. Although Roberts questioned his authority and violated store policies, Vargas chose not to discipline Roberts, instead waiting for Zenn to do so. (Vargas Dep. Doc. # 35 at 118:24-119:16). And, although "harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable," it is notable that Vargas asserts the store was exceeding expectations in sales and that the PIP he received was unwarranted. (Id. at 84:8-12, 159:11-23); Miller, 277 F.3d at 1277; see also Manganiello v. Town of Jupiter Inlet Colony, No. 12-80722-CIV, 2013 WL 6577377, at *10 (S.D. Fla. Dec. 16, 2013)("Plaintiff, however, presents no argument or evidence to support this allegation that Pierson's conduct unreasonably interfered with her job performance. To the contrary, Plaintiff stated during her deposition that she believed she had been doing well at work, received multiple pay raises, and had not had any work performance issues prior to her salary reduction in 2011.").

Furthermore, Michaels notes that Vargas never complained about any harassment or discrimination based on his race or national origin to HR. (Doc. # 34 at 17; Vargas Dep. Doc. # 35 at 100:25-101:19). Considering the totality of the circumstances, Vargas has not shown his work environment was objectively hostile.

Therefore, taking the evidence in the light most favorable to Vargas, Vargas has failed to establish a prima facie case of hostile work environment based on race or national origin.

### B.    Disparate Treatment Claims

Pursuant to Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff may establish her Title VII claim with either direct or circumstantial evidence of discrimination. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)(citing Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999)).

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without inference or presumption. Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic] constitute direct evidence of discrimination." Tippie v. Spacelabs Med., Inc., 180 F. App'x 51, 54 (11th Cir. 2006)(quoting Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla., 256 F.3d 1095, 1105 (11th Cir. 2001)). Vargas presents no direct or statistical evidence of discrimination. Thus, Vargas's case is limited to circumstantial evidence.

There are various theories of liability in disparate treatment cases, including the single-motive and mixed-motive theories. See Quigg v. Thomas Cty. Sch. Dist., 814 F.3d 1227, 1235 (11th Cir. 2016)("Discrimination claims brought under Title VII and § 1983 are typically categorized as either mixed-motive or single-motive claims."). These are separate theories of liability, not separate causes of action. Id. at 1235 n.4 ("Mixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action. Specifically, they serve as alternative causation standards for proving discrimination."). "An employee can succeed on a mixed-motive claim by showing that

illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." Id. at 1235 (quoting 42 U.S.C. § 2000e-2(m)). But "single-motive claims — which are also known as 'pretext' claims — require a showing that bias was the true reason for the adverse action." Id. Each theory has a different framework. Id. at 1237-40 (specifying the framework for mixed-motive claims after rejecting application of the McDonnell Douglas framework used for single-motive claims).

### 1. Mixed-Motive Theory of Liability

In his response to the Motion, Vargas asserts his claims should survive under either the single-motive or mixed-motive theories of liability. (Doc. # 47 at 19-23). Both in its Motion and reply, Michaels fails to address the mixed-motive framework and Vargas's assertion that the Amended Complaint pleads a basis for this theory of liability. As Michaels has failed to argue that the mixed-motive framework should not apply or that summary judgment should be granted under this framework, all of Vargas's claims survive to the extent they are brought under the mixed-motive theory of liability. See (Doc. # 10 at ¶¶ 52, 62, 76, 82, 94)(pleading that the allegedly hostile and discriminatory treatment Vargas

suffered was "substantially motivated" by his race or national origin).

## 2.  Single-Motive Theory of Liability

In analyzing allegations of single-motive discrimination supported by circumstantial evidence, the Court follows the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. See Marcelin v. Eckerd Corp. of Fla., No. 8:04-cv-491-T-17MAP, 2006 WL 923745, at *4 (M.D. Fla. Apr. 10, 2006)(citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)). Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. McDonnell Douglas, 411 U.S. at 802-03. Once the plaintiff has established a prima facie case, the burden shifts to the defendant. Id.; Dickinson v. Springhill Hosps., Inc., 187 F. App'x 937, 939 (11th Cir. 2006).

To rebut the presumption of discrimination created by the plaintiff's prima facie case, the defendant must provide "legitimate, nondiscriminatory reason[s]" for the employment action taken against the plaintiff. Burdine, 450 U.S. at 254; Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th

Cir. 1998). However, "[t]his is a burden of production, not persuasion." Standard, 161 F.3d at 1331. A defendant "must merely produce evidence that could allow a rational fact finder to conclude" its actions were not motivated by discriminatory animus. Id.

If the defendant produces such evidence, the burden shifts again to the plaintiff. McDonnell Douglas, 411 U.S. at 802–03. The plaintiff then "has the opportunity to come forward with evidence, including the previously produced evidence establishing [his] prima facie case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).

The Court will address each step in turn.

### i. Vargas Has Established a Prima Facie Case

In order to establish a prima facie case of disparate treatment, Vargas must demonstrate that he: "(1) belongs to a protected class; (2) suffered an adverse employment action; (3) was qualified to do [his] job; and (4) was treated less favorably than similarly situated employees outside of the protected class." Martin v. Rumsfeld, 137 F. App'x 324, 325 (11th Cir. 2005); see also Wilson, 376 F.3d at 1087.

Michaels argues that Vargas has not sufficiently alleged there was an adverse employment action in relation to his being placed on the PIP. (Doc. # 34 at 19-20). "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000)(citation and internal quotation marks omitted).

"[C]ourts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." Davis, 245 F.3d at 1241. To be actionable, "[t]he negative evaluation must actually lead to a material change in the terms or conditions of employment, such as 'an evaluation that directly

disentitles an employee to a raise of any significance.'" Barnett v. Athens Reg'l Med. Ctr. Inc., 550 F. App'x 711, 713 (11th Cir. 2013)(quoting Gillis v. Ga. Dept. of Corr., 400 F.3d 883, 888 (11th Cir. 2005)).

Michaels argues the PIP did not alter the terms and conditions of Vargas's employment even though Vargas would have been ineligible for a bonus when bonuses were decided in early February if he were still on the PIP at that time. (Doc. # 34 at 20). Vargas was terminated before the first thirty day interval of the PIP arrived and before the end of the fiscal year when bonus eligibility was determined, so being on the PIP did not actually prevent him from receiving a bonus — the fact that he was terminated did. (Id.). Additionally, Michaels notes that the thirty day interval of Vargas's PIP was in January and Vargas could have been taken off the PIP if he met all the goals at that time. (Id.). Thus, being placed on the PIP would not necessarily have prevented Vargas from receiving a bonus because the PIP could have ended before bonus eligibility was determined.

The Court agrees the PIP was not an adverse employment action. On the subject of adverse employment action, Vargas conclusorily states "The unwarranted PIP constitutes an adverse employment action as it led to significant job-

related consequences and affected the privileges of his employment." (Doc. # 47 at 20). Vargas has not shown that any material alteration of his terms and conditions of employment as a result of the PIP actually occurred. The Court could only conclude that the PIP was an adverse employment action if it speculated that Vargas would have failed the first interval of the PIP and thus been ineligible to receive a bonus when bonus eligibility would have been determined. But "inferences based on speculation and conjecture are not reasonable." Barnett, 550 F. App'x at 713–14 ("Thus, based on the above, the inference could not be drawn that an unsatisfactory score on [Barnett's] evaluation would preclude a merit increase."). And, indeed, Vargas asserts Michaels "would not have been able to extend the PIP as the Store was performing well and, in fact, passed the re-audit only days after [Vargas's] termination because of [his] efforts." (Doc. # 47 at 21).

Regardless, Vargas's termination was an adverse employment action. And, Michaels has not challenged other parts of Vargas's prima facie case. Although Michaels argues in its reply that there are no appropriate comparators, Michaels failed to raise this argument in its Motion and the Court will not consider it regarding the prima facie case.

See Grasso v. Grasso, 131 F. Supp. 3d 1303, 1309 (M.D. Fla. 2015)("As the Eleventh Circuit has 'repeatedly . . . admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.' As such, 'District Courts, including this one, ordinarily do not consider arguments raised for the first time on reply.'" (citations omitted)). Nor will the Court consider the new declaration of Zenn and its attachments, which Michaels attached to the reply and which shows an execution date of June 28, 2017. (Doc. # 49). Therefore, Michaels has not demonstrated that Vargas did not establish a prima facie case as to his termination.

### ii. Michaels Had a Legitimate Nondiscriminatory Reason to Terminate Vargas

Assuming Vargas established a prima facie case, Michaels argues it had a legitimate, nondiscriminatory reason to discipline and ultimately terminate Vargas. (Doc. # 34 at 20-22). Michaels's burden of rebuttal is "exceedingly light," and it "need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." Weston-Brown v. Bank of Am. Corp., 167 F. App'x 76, 80 (11th Cir. 2006)(quoting Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004)). "The reason offered

by an employer for an action does not have to be a reason that the judge or jurors would act on or approve. Instead, all that matters is that the employer advance an explanation for its action that is not discriminatory in nature." Schoenfeld, 168 F.3d at 1269 (internal citation and quotations omitted).

Michaels argues its legitimate, non-discriminatory reason for firing Vargas was his creation of a hostile work environment by seeking out the names of employees who complained about him. (Doc. # 34 at 22). Michaels received a complaint from Faircloth that Vargas sought the names of those who complained about him and instructed Faircloth to inform him about any future complaints before they could be reported. (Doc. # 41-1). Zenn stated Michaels interpreted this behavior as retaliation and decided to terminate Vargas for that reason. (Zenn Dep. Doc. # 36 at 209:1-5). This is a sufficient legitimate, non-discriminatory reason. The burden now shifts back to Vargas to show a genuine issue of material fact as to pretext.

### iii. <u>Vargas Has Not Shown Pretext</u>

"A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was

impermissible retaliation or discrimination." <u>Worley v. City of Lilburn</u>, 408 F. App'x 248, 251 (11th Cir. 2011)(citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993)). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must meet it 'head on and rebut it.'" <u>Id.</u> (quoting <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir. 2000)).

"An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." <u>Damon v. Fleming Supermarkets of Fla., Inc.</u>, 196 F.3d 1354, 1363 (11th Cir. 1999). As the Eleventh Circuit has explained:

> [I]n carrying out its business and in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law. In the workaday world, not every personnel decision involving a false statement (or a cover-up) has to be treated as something like a trial for perjury. Therefore, an employer, in these situations, is entitled to rely on its good faith belief about falsity, concealment, and so forth.

<u>E.E.O.C. v. Total Sys. Servs., Inc.</u>, 221 F.3d 1171, 1176 (11th Cir. 2000).

To establish pretext, Vargas argues that Faircloth's complaint about retaliation was false. (Doc. # 47 at 23). Still, Vargas's assertion that he never inquired into who

42

complained, as Faircloth alleged, is not evidence that the decision to terminate him for retaliation was pretextual. Cf. Soloski v. Adams, 600 F. Supp. 2d 1276, 1360 (N.D. Ga. 2009)("That the findings reported to Mace were wrong is not evidence that the decision was pretextual. An employer may make an employment decision 'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984))). Vargas does not dispute that Faircloth's complaint was given to Zenn and then passed on to Michaels's HR. Although Vargas considers it suspicious that Faircloth's complaint was submitted days before he received the PIP yet was not discussed with him, Zenn stated he did not address Faircloth's complaint when he issued Vargas the PIP because Faircloth's complaint was unrelated to the PIP and the loss prevention investigation. (Zenn Dep. Doc. # 36 at 221:17-25, 222:8-16, 223:1-18). Vargas does not present any evidence the complaint was fabricated by Faircloth at Zenn's direction.

Instead, Vargas emphasizes that Roberts was told by Zenn that Vargas would be fired a week before it occurred and that Roberts would be made store manager. (Doc. # 47 at 23). But

Zenn's alerting Roberts to Vargas's imminent termination does not imply that Vargas's termination was not based on his alleged retaliation against associates. Again, so long as an action is not motivated by a discriminatory reason, it is not illegal, even if the reason was incorrect or unfair. See Smith v. City of Fort Pierce, 565 F. App'x 774, 779 (11th Cir. 2014)(citing Nix, 738 F.2d at 1187); Thomas v. Nicholson, 263 F. App'x 814, 816 (11th Cir. 2008)(citing Damon, 196 F.3d at 1361)).

Vargas asserts that Michaels "conducted no investigation of the [retaliation complaint], despite its own policy requiring it to do so." (Doc. # 47 at 23). He also notes that Roberts and Ticich, who were terminated while holding the respective positions of store manager and district manager, were only terminated after complete investigations in which they were able to defend themselves and address the charges against them. (Doc. # 47 at 21-22). But while the failure to give Vargas a sufficient opportunity to deny Faircloth's allegations might have been unfair, that does not support the inference that Faircloth's complaint was not the true basis for Vargas's termination or that the real reason was discriminatory.

And the terminations of the two other Hispanic store managers Vargas knew does not support an inference of pretext. These other store managers worked in New York stores, and the decision to fire them would not have been made by Zenn and Gingrich, the parties involved in Vargas's termination. Furthermore, Vargas has presented only his testimony that, during phone conversations with Salazar and Narvaez, those men expressed their belief their terminations were related to race. Without more, their terminations cannot support an argument that Vargas's termination was related to his race or national origin.

Therefore, Vargas has not presented sufficient evidence to establish a genuine issue of material fact concerning pretext.

## IV. **Conclusion**

No genuine issue of material fact exists as to the hostile work environment claims or claims brought under the single-motive theory of liability, and summary judgment is granted as to those claims. But, because the Motion did not address the mixed-motive framework and the Amended Complaint plausibly pled a basis for a mixed-motive theory of liability, Counts I through V survive to the extent they are brought under the mixed-motive theory of liability.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)    Defendant Michaels Stores, Inc.'s Motion for Summary Judgment (Doc. # 34) is **GRANTED IN PART AND DENIED IN PART.**

(2)    The Motion is **GRANTED** as to Counts I through V to the extent they assert claims for hostile work environment or single-motive discrimination.

(3)    The Motion is **DENIED** as to Counts I through V to the extent they are brought under the mixed-motive theory of liability. Vargas may proceed on these mixed-motive discrimination claims only.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 10th day of July, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE